UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| JEREMIAH ADZOGBLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-04237-SLD-JEH |
| | ) | |
| TYSON FRESH MEATS, INC.,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant Tyson Fresh Meats, Inc.'s Motion for Summary Judgment, ECF No. 41. For the following reasons, the motion is GRANTED to the extent that it seeks judgment on Plaintiff Jeremiah Adzogble's failure to accommodate and retaliation claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–213, and his claims under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–54.

## BACKGROUND[2]

### I.     The Joslin Facility and Defendant's Policies

Defendant produces and supplies beef and pork products to retail grocers, foodservice distributors, and restaurants around the world. One of its beef facilities, located in Joslin, Illinois, employs approximately 2,400 employees. Some of the workers at the Joslin facility are members of the United Food & Commercial Workers Local Union 1546 (the "Union") and are

---

[1] Defendant indicates that it should be sued as Tyson Fresh Meats, Inc. rather than Tyson Foods, Inc.; Tyson Foods, Inc. is Tyson Fresh Meats, Inc.'s parent company. *See* Def.'s Mem. Supp. Mot. Summ. J. 1 n.1, 2, ECF No. 42. The Clerk is directed to update the docket accordingly.

[2] At summary judgment, a court must "constru[e] the record in the light most favorable to the nonmovant." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Unless otherwise noted, the factual background of this case is drawn from Defendant's statement of undisputed material facts, Def.'s Mem. Supp. Mot. Summ. J. 2–11; Plaintiff's statement of disputed material facts and additional material facts, Pl.'s Mem. Supp. Resp. Mot. Summ. J. 1–5, ECF No. 45-1; Defendant's reply to Plaintiff's additional material facts, Def.'s Reply 2–7, ECF No. 46; and exhibits to the filings.

subject to the terms of a collective bargaining agreement ("CBA").  Under Article 18 of the CBA, employees with more than six months of seniority are eligible to bid on open jobs; except in limited circumstances, vacant jobs are awarded by seniority.

Defendant has written policies that prohibit employment discrimination, harassment, and retaliation, as well as a policy regarding accommodations under the ADA.  It also has in place a Leave of Absence Policy ("LOA Policy"), which provides that an employee may take an unpaid leave of absence of up to twelve months for personal reasons, even if the leave of absence is not protected under the FMLA.  Under this policy, an employee may be terminated if he does not return to work at the end of the approved leave of absence.

## II.    Plaintiff's Employment History

Plaintiff was diagnosed with glaucoma over ten years ago.  His vision continued to deteriorate, and in 2016, he became legally blind.  He is no longer able to drive, and he often uses a cane for walking.  He can only read very large written text (he reads primarily in Braille) and frequently uses software that makes written text audible.

Defendant hired Plaintiff to work at the Joslin facility in February 2012.  On March 1, 2012, he was assigned the role of Hang Paper on Brisket, in which he was tasked with placing sheets of paper on cow carcasses to prevent them from being exposed to potential airborne contaminants as they moved along the production line.  He held that role for several years.  In late June 2016, while performing his job, some contamination got into his eyes.  He went to the hospital a few days later and was diagnosed with chemical conjunctivitis.  On July 8, 2016, as a temporary accommodation for his eye injury, he was assigned the role of Box Tongues.

In June 2017, Plaintiff was transferred back to the Hang Paper on Brisket role[3] as an accommodation because his vision had deteriorated to the point that it was one of the few roles he could safely perform.  Plaintiff and Defendant engaged in discussions regarding additional accommodations.  Defendant provided Plaintiff with training, permitted him to wear a specific type of prescription safety glasses Plaintiff himself provided, and, when necessary, arranged for Plaintiff's co-workers to drive him to and from work and to physically escort him to and from his work station.[4]  In October 2017, Plaintiff complained that as the cow carcasses moved along the production line, their hooves were hitting his knees and injuring him.  He was given knee pads as an accommodation, and he later reported that the knee pads were helping with the issue.

Plaintiff continued to perform the Hang Paper on Brisket role for over a year while keeping Defendant apprised of the progression of his glaucoma and his doctors' recommendations.  On May 17, 2018, one of Plaintiff's eye doctors wrote a note reiterating that Plaintiff was legally blind due to very severe glaucoma and stating that the Hang Paper on Brisket role—which did not involve operating heavy machinery—was still suitable for him.  *See* May 17, 2018 Doctor's Note, Myrtue Aff. Ex. 7, ECF No. 43-2 at 38.  On October 6, 2018, another doctor wrote that his "original recommendations of a working environment that is well lit, clean, a walkway that doesn't have any objects in his path that he might trip on, hit his head

---

[3] It is not entirely clear what jobs Plaintiff held between the temporary assignment to Box Tongues and the June 2017 reassignment to Hang Paper on Brisket.  It appears that the temporary assignment ended on July 27, 2016, after which time Plaintiff was returned to the Hang Paper on Brisket role.  *See* Sept. 30, 2016 Medical R. Report, Pl.'s Resp. Mot. Summ. J. Ex. 2, ECF No. 45-2 at 5.  However, the form transferring Plaintiff to the Hang Paper on Brisket job in June 2017 states that prior to that, he was a "[n]o [j]obber."  Qualification/Disqualification Form, Myrtue Aff. Ex. 6, ECF No. 43-2 at 36.  The materials provided to the Court do not clarify if Plaintiff had further job changes between these assignments.
[4] Defendant also asserts that it "ensured that Plaintiff's work station was clean, well-lit and clear of tripping hazards."  Def.'s Mem. Supp. Mot. Summ. J. 5 (citing Myrtue Aff. ¶ 15, Def.'s Mem. Supp. Mot. Summ. J. Ex. B, ECF No. 43-2 at 2–9).  Plaintiff states that this accommodation was not provided because he "worked in blood and contaminations" "[w]ith no additional light to see better or in a dark/ smoke [sic]," Pl.'s Mem. Supp. Resp. Mot. Summ. J. 2, but cites to no evidence to support this, as required by the Local Rules.  *See* Civil L.R. 7.1(D)(2)(b)(2) ("Each claim of disputed fact must be supported by evidentiary documentation referenced by specific page.").

on, and also the wearing of safety eyewear at all times is still appropriate."  Oct. 6, 2018

Doctor's Note, Myrtue Aff. Ex. 8, ECF No. 43-2 at 40.

On or around October 30, 2018, Plaintiff met with Defendant's Human Resources

Manager Amy Myrtue and informed her that he no longer wished to perform the Hang Paper on

Brisket job.  The parties disagree as to why Plaintiff did so: Defendant claims that Plaintiff failed

to explain his reasoning at that meeting, "confirmed that he was physically and medically able to

continue working in the role," and "acknowledged that [Defendant] already had granted and

implemented various workplace accommodations," Def.'s Mem. Supp. Mot. Summ. J. 6, ECF

No. 42 (citing Myrtue Aff. ¶ 19, Def.'s Mem. Supp. Mot. Summ. J. Ex. B, ECF No. 43-2 at 2–9;

Adzogble Dep. 58:21–24, Def.'s Mem. Supp. Mot. Summ. J. Ex. A, ECF No. 43-1[5]), whereas

Plaintiff argues that he did not want to continue in the role because he was getting injured at his

job and Defendant refused to provide accommodations, Pl.'s Mem. Supp. Resp. Mot. Summ. J.

2–3, ECF No. 45-1.  Defendant placed Plaintiff on an unpaid leave of absence, effective October

30, 2018.  Myrtue provided Plaintiff with FMLA forms in case he wished to have his leave

designated as FMLA-protected leave; Plaintiff did not complete or return the forms.  As a result,

Defendant treated Plaintiff's leave as an unpaid, non-FMLA-protected leave under Defendant's

LOA Policy.

Myrtue remained in contact with Plaintiff.  In November 2018, Defendant re-offered the

Hang Paper on Brisket job to Plaintiff on a temporary basis to give him time to consider whether

he wished to return permanently to that job or to engage in discussions with Defendant as to

other jobs at the Joslin facility he might be able to perform.  Plaintiff declined the offer,

---

[5] Only excerpts from Plaintiff's deposition are provided.

"choos[ing] to stay off work at [his] own discretion."  Declination of Temporary Duty Assignment, Myrtue Aff. Ex. 10, ECF No. 43-2 at 44.

On January 14, 2019, while still on leave, Plaintiff sent a letter to the Joslin facility's Human Resources Department making seven requests, which he termed "reasonable accommodations."  *See* Jan. 14, 2019 Letter, Myrtue Aff. Ex. 11, ECF No. 43-2 at 46.  He asked 1) to be paid for one day on which he stayed home because of his health condition, 2) to have video of his workplace sent to the Occupational Safety and Health Administration ("OSHA") and two doctors in order to aid with determining permanent accommodations, 3) to have access to his paystubs, 4) to get information concerning his ability to return to work, 5) to receive additional training, 6) to obtain a device to talk to his supervisors regarding safety concerns he might observe, and 7) to have Defendant purchase special glasses for him to use at work.  *See id*. Defendant noted that it had already granted some of these requests but objected to the request for video "because (a) [Defendant] considers its production processes to be confidential and proprietary, and (b) neither OSHA nor Plaintiff's physicians had requested a video of Plaintiff's work station."  Myrtue Aff. ¶ 25.[6]

In mid-January 2019, Plaintiff bid on an open job, Rip Tails, which involved using a very sharp knife to remove cow hide.[7]  Another employee won the bid due to having greater seniority. In May 2019, Plaintiff bid on another job, Split Saw Operator, which entailed operating a handheld power saw.[8]  An employee with greater seniority won that bid as well.

---

[6] It is not clear from the record how or whether Defendant directly responded to Plaintiff's letter.
[7] Plaintiff denies that he "sign[ed] up for" this job, Pl.'s Mem. Supp. Resp. Mot. Summ. J. 3, but he provides no evidence to support this.  *See* Civil L.R. 7.1(D)(2)(b)(2).
[8] Plaintiff disputes that he "sign[ed] up for" this job, but the exhibit to which he cites says nothing about whether or not he made a bid.  *See* Pl.'s Mem. Supp. Resp. Mot Summ. J. 3 (citing May 18, 2019 Letter, Pl.'s Resp. Mot. Summ. J. Ex. 11, ECF No. 45-3 at 12).

On October 30, 2019, one full year from when Plaintiff's unpaid leave of absence under the LOA Policy began, Myrtue sent Plaintiff a letter stating that his leave had expired and that if he did not contact Defendant by November 13, 2019, it would terminate his employment. Plaintiff did not respond, and his employment was terminated effective December 9, 2019.

### III.     Social Security Benefits

In December 2018, Plaintiff applied for social security disability benefits.  In his application, Plaintiff identified the start date of his disability as October 30, 2018 and indicated that he was not currently able to work.  Plaintiff was ultimately granted social security disability benefits.

### IV.     Procedural History

Plaintiff received a right to sue notice from the Equal Employment Opportunity Commission on September 8, 2020.  *See* Dismissal and Notice of Rights, ECF No. 1-3. Proceeding *pro se*, Plaintiff initiated this suit on November 16, 2020, Compl., ECF No. 1, and filed an amended complaint on October 26, 2021, Am. Compl., ECF No. 10.  He brings claims under the ADA and the FMLA and alleges that Defendant failed to reasonably accommodate him, retaliated against him for seeking accommodations, and discriminated against him on the basis of his disability by terminating him.  *See id*. at 2–3.  Defendant filed the instant motion on March 10, 2023.

## DISCUSSION

### I.     Legal Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where one party has properly moved for summary judgment, the nonmoving

party must respond "by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Parties may not merely refer to their own pleadings, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), but must instead "cit[e] to particular parts of materials in the record, including depositions, documents, [and] . . . affidavits or declarations" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute," Fed R. Civ. P. 56(c)(1).[9]

The court is to "constru[e] the record in the light most favorable to the nonmovant," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003), "resolving all factual disputes and drawing all reasonable inferences in favor of [the nonmovant]," *Grant*, 870 F.3d at 568. However, the nonmovant "is not entitled to the benefit of inferences that are supported by only speculation or conjecture." *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (quotation marks omitted).

## II.   Analysis

Defendant moves for summary judgment on Plaintiff's failure to accommodate and retaliation claims brought under the ADA and on his FMLA claims. Def.'s Mem. Supp. Mot. Summ. J. 1–2, 12–21.[10] Plaintiff opposes summary judgment. Pl.'s Resp. Mot. Summ. J. 1, ECF

---

[9] "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).
[10] Defendant states that it is asking for summary judgment "on all counts of Plaintiff's *pro se* complaint, Def.'s Mot. Summ. J. 1, but as discussed below, *see infra* Section II(b)(iii), Defendant does not address Plaintiff's claim that he was terminated because of his disability in violation of the ADA, *see* Am. Compl. 2–4.

No. 45.  The Court will address each of Defendant's arguments in turn, beginning with those pertaining to the FMLA claims.

### a.  FMLA Claims

In the amended complaint, Plaintiff seeks to hold Defendant liable for violating the FMLA.  Am. Compl. 2.  He does not specify his theories of relief under the FMLA, so the Court will assume he intends to bring claims for interference with his rights under the FMLA and for retaliation.  *See* 29 U.S.C. § 2615 (prohibiting employers from interfering with employees' FMLA rights and from retaliating against employees who assert their FMLA rights).[11]

First, Defendant argues that Plaintiff "has affirmatively abandoned his FMLA claim(s)" by testifying in his deposition that "he didn't ask for FMLA and did not take any steps to complete and submit FMLA paperwork."  Def.'s Mem. Supp. Mot. Summ. J. 19 (quotation marks omitted).  The Court disagrees that Plaintiff has abandoned these claims.  Defendant is correct that Plaintiff testified in his deposition that he "didn't ask for FMLA," did not give the forms to his doctor, and did not return any FMLA paperwork to Defendant.  *See* Adzogble Dep. 59:20–60:5.  But Plaintiff later confirms in his deposition that he is "alleging that [Defendant] . . . violated the [FMLA]," *id*. at 70:15–18, indicating that he intends to pursue his FMLA claims. *See also* Pl.'s Mem. Supp. Resp. Mot. Summ. J. 9 (making arguments related to his FMLA claims).  Defendant appears to believe that Plaintiff's testimony that he never asked nor applied for FMLA indicates that he concedes his FMLA claim is not viable, *see* Def.'s Mem. Supp. Mot. Summ. J. 19, but this ignores Plaintiff's theory of the claim: that Defendant violated the FMLA by providing him with FMLA forms as an excuse to send him home even though he did not ask for FMLA leave.  *See* Adzogble Dep. 70:20–21 ("I didn't ask for FMLA, so Amy used the

---

[11] The Court has not discerned any other potential avenues for relief under the FMLA.

FMLA to send me home.").  Whether this theory is legally sound is a question better addressed on the merits.

In the alternative, Defendant argues that Plaintiff has failed to establish a genuine dispute of material fact as to either an FMLA interference or retaliation claim.  Def.'s Mem. Supp. Mot. Summ. J. 19–21.  The Court will first examine whether any interference claim can survive summary judgment.

Under the FMLA, eligible employees are entitled to twelve weeks of leave during a twelve-month period for qualifying family or health reasons, 29 U.S.C. § 2612(a)(1), and employers are prohibited from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise" this entitlement, *id*. § 2615(a)(1).  To prevail on an FMLA interference claim, a plaintiff must

> show that: (i) [he] was eligible for FMLA protections; (ii) the employer was covered by the FMLA; (iii) [he] was entitled to leave under the FMLA; . . . (iv) [he] provided sufficient notice of intent to take FMLA leave[;]

and the employer denied or otherwise interfered with the FMLA benefits due him.  *Ziccarelli v. Dart*, 35 F.4th 1079, 1084–85 (7th Cir. 2022).[12]

Plaintiff has put forth no evidence to show that he provided notice of his intent to take FMLA leave or that Defendant interfered with his FMLA rights.  Nothing in the record shows that he informed Defendant that he intended to take FMLA leave, and while "[a]n employee need not expressly mention the FMLA . . . or otherwise invoke any of its provisions," *Burnett v. LFW Inc.*, 472 F.3d 471, 478 (7th Cir. 2006),[13] Plaintiff expressly denies that he wanted to take FMLA

---

[12] *Ziccarelli* clarified that a plaintiff need not show that the employer actually denied him FMLA benefits to prevail on an interference claim.  *Ziccarelli*, 35 F.4th at 1085–86.  "Interference or restraint alone is enough to establish a violation," and the plaintiff may recover for the violation if he shows it prejudiced him.  *Id*. at 1089.

[13] Rather, the employer must "designate leave as FMLA-qualifying and give notice of the designation to the employee."  *Ridings v. Riverside Med. Ctr*., 537 F.3d 755, 762 (7th Cir. 2008).

leave and confirms that he did not turn in the requisite forms or give them to his doctor to fill out, Adzogble Dep. 59:4–60:5; *see Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008) ("[T]he failure to turn in the [FMLA] forms forecloses [the employee's] ability to persevere on an FMLA interference claim because she did not fulfill her obligations in order to be protected.").  Moreover, Defendant affirmatively provided Plaintiff with FMLA forms to provide him the option of having his leave designated as FMLA-protected, *see* Myrtue Aff. ¶ 20, which Plaintiff admits, *see* Adzogble Dep. 58:25–59:3.  As such, there is no genuine dispute of material fact that Plaintiff did not provide the requisite notice and that Defendant did not prejudicially interfere with Plaintiff's right to take FMLA leave.  *See Ridings*, 537 F.3d at 764 (finding no prejudice where the employer "provided [the employee] with the FMLA forms she needed . . . and . . . gave her ample opportunity to fulfill its request for additional information from her physician"); *Bailey v. Sw. Gas Co*., 275 F.3d 1181, 1186 (9th Cir. 2002) ("Because [the employee] never sought to invoke her FMLA rights, she may not now argue that [her employer] interfered with the exercise of her rights by suggesting the FMLA might apply, providing her with information on it, and seeking a medical certification of her condition.").

The Court has not found—and Plaintiff has not provided—any legal support for his argument that Defendant interfered with his rights by proactively providing him with FMLA forms and encouraging him to take it.  *See* Pl.'s Mem. Supp. Resp. Mot. Summ. J. 3, 9; *cf. Ridings*, 537 F.3d at 769 n.3 (rejecting a similar argument and noting that "[i]f an employee does not wish to take FMLA leave but continues to be absent from work," termination is justified unless the employee provides another acceptable reason for his absence).

As for any FMLA retaliation claim, the Court likewise concludes that Defendant is entitled to summary judgment.  "Retaliation claims under the FMLA . . . require three . . .

elements: (1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018).  There is no evidence to show that Plaintiff engaged in statutorily protected activity by seeking to assert his rights under the FMLA.  *See id.* (noting that the plaintiff "engaged in statutorily protected activity by using his FMLA leave because of his medical ailments").  It is undisputed that Plaintiff never attempted to take FMLA leave.  *See* Def.'s Mem. Supp. Mot. Summ. J. 7; Pl.'s Mem. Supp. Resp. Mot. Summ. J. 3; *see also* Adzogble Dep. 59:20–60:5.  And Plaintiff has cited to no law showing that *declining* to take FMLA leave constitutes protected activity under the statute.  *Cf. Ridings*, 537 F.3d at 772 ("An employer cannot be deemed to retaliate against an employee by asking her to fulfill her obligations under the FMLA.").  As such, Plaintiff cannot prevail on an FMLA retaliation claim.

The Court accordingly grants summary judgment for Defendant on Plaintiff's FMLA claims.

### b.  ADA

In the amended complaint, Plaintiff alleges that Defendant violated the ADA by failing to reasonably accommodate his disabilities, by retaliating against him, and by terminating him.  *See* Am. Compl. 2–4.  Defendant argues that it is entitled to summary judgment on the failure to accommodate and retaliation claims.  Def.'s Mem. Supp. Mot. Summ. J. 1–2, 12–18.  The Court looks first to the failure to accommodate claim.

### i.  Failure to Accommodate

The ADA provides that covered employers may not discriminate against qualified individuals on the basis of disability.  42 U.S.C. § 12112(a).  "Discrimination" includes the

failure to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." *Id.* § 12112(b)(5)(A). To prevail on a failure to accommodate claim, "a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).

Defendant asserts that Plaintiff cannot be considered a qualified individual after October 30, 2018 because he applied for and accepted social security disability benefits, effectively representing to the Social Security Administration that he was "totally disabled" as of that date. *See* Def.'s Mem. Supp. Mot. Summ. J. 12, 15–16. Defendant further contends that there is no genuine dispute of material fact that it reasonably accommodated him. *Id.* at 12–15. The Court turns first to Defendant's argument as to Plaintiff's social security disability benefits.

### 1. Qualified Individual with a Disability

A "qualified individual" is one who, "with or without reasonable accommodation, could perform the essential functions of the employment position." *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001). While on first impression, a claim under the ADA might appear incompatible with the receipt of social security disability benefits, the Supreme Court has held that they are not mutually exclusive, nor is there even a "strong presumption against the [social security] recipient's success under the ADA." *See Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 797–98 (1999). This is because, under the ADA, a "qualified individual" is one who can perform her job with reasonable accommodation, whereas the Social Security Administration does not take the possibility of reasonable accommodation into account when evaluating a potential social security claimant. *Id.* at 802–03. Even so, "an ADA plaintiff cannot simply

ignore her . . . contention [before the Social Security Administration] that she was too disabled to work." *Id*. at 798. Rather, "[t]o survive a defendant's motion for summary judgment, she must explain why that . . . contention is consistent with her ADA claim that she could 'perform the essential functions'" of her job with or without reasonable accommodation. *Id*.

Here, it is undisputed that Plaintiff applied for social security disability benefits in December 2018, identifying the start date of his disability as October 30, 2018 and affirming that he was not able to work after that date. *See* Social Security Application 8, 10, 12, Moeller Aff. Ex. 4, ECF No. 43-3 at 19–23; *see also Johnson v. Green Auto. Ltd*., No. 15-cv-3198, 2018 WL 11009415, at *3 (C.D. Ill. Feb. 13, 2018) (noting that "when [the plaintiff] applied for benefits, he necessarily alleged to the Social Security Administration that he could not engage in any substantial gainful activity as of" the alleged disability onset date). He was ultimately granted benefits. *See* Moeller Aff. ¶ 2, Def.'s Mem. Supp. Mot. Summ. J. Ex. C, ECF No. 43-3 at 2–3. But Plaintiff asserts in his response to the motion for summary judgment that he was able to work with accommodations after October 30, 2018. *See, e.g.*, Pl.'s Mem. Supp. Resp. Mot. Summ. J. 3 ("[D]efendant [has] jobs that I can do . . . ."); *id*. at 8 ("I sent a note to work [in 2019] . . . that I can work with accommodations."). Thus, for his failure to accommodate claim to survive summary judgment for the post-October 30, 2018 period, he must provide an explanation for the discrepancy between his statement in his social security application that he could not work and his ADA claim. He has failed to do so.[14] As such, he is not a qualified individual for purposes of the ADA after his alleged disability onset date of October 30, 2018.[15]

---

[14] Indeed, Plaintiff barely addresses Defendant's argument as to his social security disability benefits. *Cf*. Pl.'s Mem. Supp. Resp. Mot. Summ. J. 7 (merely acknowledging that he began receiving social security disability benefits in 2019 and that they were based on his blindness).
[15] This finding does not affect whether Plaintiff was a qualified individual prior to October 30, 2018.

## 2. Reasonable Accommodation

The Court will look next to Defendant's argument that it reasonably accommodated Plaintiff.[16]  To determine a reasonable accommodation, an employer and employee should "engage in an interactive process."  *Sears*, 417 F.3d at 797 (quotation marks omitted).  "If a disabled employee shows that her disability was not reasonably accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process."  *Id*.  At summary judgment, it is the burden of the plaintiff to provide evidence that his employer did not reasonably accommodate his disability.  *King v. City of Madison*, 550 F.3d 598, 600 (7th Cir. 2008) ("To survive [the defendant's] motion for summary judgment on her failure-to-accommodate claim, [the plaintiff] needed to present evidence that, if believed by a trier of fact, would show . . . that [the defendant] failed to reasonably accommodate that disability.").  Reasonable accommodations may include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities" and "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . [and] training materials or policies."  42 U.S.C. § 12111(9).

It is clear from the record that Defendant worked with Plaintiff extensively to accommodate his disabilities, including but not limited to his glaucoma.  When Plaintiff got contamination in his eyes in mid-2016, Defendant temporarily assigned him to the role of Box Tongues as an accommodation and specified that he needed to wear protective eye wear.  *See* Sept. 30, 2016 Medical R. Report, Pl.'s Resp. Mot. Summ. J. Ex. 2, ECF No. 45-2 at 5; July 8,

---

[16] The Court will examine this argument both as it pertains to the time period prior to October 30, 2018 and as an alternative basis for dismissal for the period after October 30, 2018 during which he was no longer a qualified individual with a disability.

2016 Job Activity Notification, Pl.'s Resp. Mot. Summ. J. Ex. 12, ECF No. 45-3 at 16.[17]  In June

2017, due to Plaintiff's deteriorating vision, Defendant assigned Plaintiff to the Hang Paper on

Brisket role as an accommodation, as this position did not require the operation of heavy

machinery, the use of tools such as knives or saws, or the lifting of heavy objects.  Myrtue Aff.

¶¶ 13, 14; Qualification/Disqualification Form, Myrtue Aff. Ex. 6, ECF No. 43-2 at 36.  One of

Plaintiff's physicians opined as late as May 2018 that the Hang Paper on Brisket role was

suitable for him.  *See* May 17, 2018 Doctor's Note.  Defendant also provided Plaintiff with extra

training, arranged for his co-workers to drive him to and from work and escort his to and from

his work station when necessary,[18] and permitted him to wear prescription safety goggles that

Plaintiff himself provided.[19]  Myrtue Aff. ¶ 15.

Plaintiff argues that Defendant failed to reasonably accommodate him with regards to the

knee injuries he sustained from being hit by the hooves of cow carcasses as they swung by on the

production line.  *See* Pl.'s Mem. Supp. Resp. Mot. Summ. J. 6.[20]  He testified in his deposition

that he believes that Defendant "could have cut off the feet" of the cow carcasses earlier on the

---

[17] Plaintiff argues that "[D]efendant refused to help [him] go to the nursing room" after the contamination incident. Pl.'s Mem. Supp. Resp. Mot. Summ. J. 2.  He cites to a medical record in which he informed the treating nurse that he had needed to take himself to health services as opposed to having his supervisor bring him there.  Sept. 30, 2016 Medical R. Report.  This does not appear to bear on the issue of whether Defendant provided reasonable accommodations, as it does not involve Plaintiff's ability to perform his job.  *See Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995) (defining "accommodation" as "changes in [an employer's] ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work").

[18] Plaintiff argues that "[D]efendant refused to disclose the name on the agreement between [it] and [his] co-workers to drive or escort [him]."  Pl.'s Mem. Supp. Resp. Mot. Summ. J. 2.  He does not cite to any evidence to support this, and it is uncertain what this means or how this bears on his reasonable accommodations.

[19] The wearing of safety goggles is consistent with a recommendation from Plaintiff's doctor.  *See* Oct. 6, 2018 Doctor's Note (opining that the doctor's "original recommendation[] of . . . the wearing of safety eyewear at all times [wa]s still appropriate" as of October 6, 2018).  Plaintiff complains that Defendant "refused to provide [him] with the OSHA prescription approved glasses." Pl.'s Mem. Supp. Resp. Mot. Summ. J. 2.  However, "[r]easonable accommodation does not require an employer to provide literally everything the disabled employee requests," *Schmidt v. Methodist Hosp. of Ind., Inc.*, 89 F.3d 342, 344 (7th Cir. 1996), and it is undisputed that Plaintiff owned a different pair of prescription safety goggles that Defendant permitted him to wear, Myrtue Aff. ¶ 15.

[20] Myrtue attests that she is not aware of any such requests made by Plaintiff and states that "after a thorough and diligent review of Plaintiff's personnel records, [she] d[id] not see any record of any such request in Plaintiff's file." Myrtue Aff. ¶ 26.

production line so that they would not hit him or Defendant "could have had the machine stop so that the feet would not hurt [him]."  Adzogble Dep. 36:12–14.  But he admits that he was permitted to wear knee pads to protect his knees from the cow hooves, *id.* at 39:9–16, and he told doctors that the knee pads were helping him with the issue, *see* Oct. 24, 2017 Medical R. Report, Pl.'s Resp. Mot. Summ. J. Ex. 3, ECF No. 45-2 at 10 (noting that Plaintiff had been issued knee pads to protect his knees); Oct. 30, 2017 Medical R. Report, Pl.'s Resp. Mot. Summ. J. Ex. 3, ECF No. 45-2 at 10, 11 (noting that that the "knee pads [we]re helping" (capitalization altered)); Nov. 7, 2017 Medical R. Report, Pl.'s Resp. Mot. Summ. J. Ex. 3, ECF No. 45-2 at 11 (noting that Plaintiff "continue[d] to wear [the] knee pads he was provided with" and that "this does help somewhat" (capitalization altered)).  Plaintiff may have preferred to have Defendant rearrange its production line so that the hoof-cutting procedure occurred prior to the carcasses reaching him, *see* Adzogble Dep. 44:15–19, 63:11–19, but an employee is not entitled to every accommodation he requests, especially where the request may not be feasible without huge cost to the employer. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000) ("It is well-established that an employer is obligated to provide a qualified individual with a reasonable accommodation, not the accommodation he would prefer."); *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 542–43 (7th Cir. 1995) (finding that an employer is not "required to expend enormous sums in order to bring about a trivial improvement in the life of a disabled employee" under the reasonable accommodations framework).

Plaintiff also contends that Defendant failed to accommodate him because the kill floor on which he worked was "full of blood and contamination" and was "unsafe."  Pl.'s Mem. Supp. Resp. Mot. Summ. 6; *cf.* Oct. 6, 2018 Doctor's Note (noting that the doctor's "original recommendations of a working environment that is well lit, clean, [and has] a walkway that

doesn't have any objects in his path that he might trip on[ or] hit his head on . . . [were] still appropriate").  Defendant asserts that it "ensured that Plaintiff's work station was clean, well-lit and clear of tripping hazards" and cites to the Myrtue Affidavit in support.  Def.'s Mem. Supp. Mot. Summ. J. 5 (citing Myrtue Aff. ¶ 15).  Plaintiff disputes this, stating that he "worked in blood and contaminations" "[w]ith no additional light to see better or in a dark/ smoke [sic]," Pl.'s Mem. Supp. Resp. Mot. Summ. J. 2, but he cites to no evidence to support this, which he must in order to properly dispute Defendant's factual statement.  *See* Civil L.R. 7.1(D)(2)(b)(2) ("Each claim of disputed fact must be supported by evidentiary documentation referenced by specific page.").[21]  Having reviewed the record, the Court has not found other evidence to support Plaintiff's claim that his work environment was dirty and dimly lit beyond the contamination incident referenced above, as to which the Court found that Defendant provided adequate accommodations.[22]

In addition, Plaintiff asserts that Defendant failed to reasonably accommodate him "[b]y refusing to help [him] sign up for jobs."  Pl.'s Mem. Supp. Resp. Mot. Summ. J. 6.  He does not elaborate, but the record does not support Plaintiff's argument.  After Plaintiff began his leave of

---

[21] The only citation contained in that numbered section pertains to Plaintiff's statement that Defendant "refused to meet with [his] counselor to help [him]," Pl.'s Mem. Supp. Resp. Mot. Summ. J. 2, and, moreover, refers only to a letter from a caseworker from the Illinois Department of Human Services ("IDHS") providing information about Plaintiff's vision and offering to meet with Defendant to discuss accommodations for Plaintiff, IDHS Letter, Pl.'s Resp. Mot. Sum. J. Ex. 1, ECF No. 45-2 at 3.

[22] Plaintiff testified in his deposition that he "would not need that much assistance" going between his work station and other locations in the facility "unless there was blood on the floor or meat or garbage on the floor" or "if there were things . . . in front of [him] that [he] wouldn't see properly or clearly."  Adzogble Dep. 35:5–13.  Lacking any detail as to when, how often, or even if Plaintiff encountered blood or garbage on the floor or tripping hazards during the relevant time period, this statement does not create a genuine dispute of material fact as to whether Defendant reasonably accommodated Plaintiff as to the cleanliness of the facility.  Plaintiff also provides the Court with a form dated October 30, 2018 describing accommodations requested by Plaintiff to continue to do the Hang Paper on Brisket job, which lists as "[p]otential [b]arriers to [r]equested [a]ccommodation" "[i]tems on the floor creating trip hazards on production floor, not being clean and objects that he may hit [his] head on."  *See* Form B: Interactive Process, Pl.'s Resp. Mot. Summ. J. Ex. 14, ECF No. 45-3 at 20.  Not only was this form created on the day Plaintiff ceased to be a qualified individual with a disability, *see supra* Section II(b)(i)(1), but it also does not constitute evidence that such barriers actually existed and prevented Plaintiff from doing his job.

absence on October 30, 2018, Myrtue "remained in contact with Plaintiff" and told him that

Defendant "was willing to give him some time to reconsider whether he wished to return to the

Hang Paper [on Brisket] job" and "was willing to explore with him whether there were

alternative jobs . . . which he was able to perform competently and safely."  Myrtue Aff. ¶ 22.

Defendant also reoffered the Hang Paper on Brisket job to Plaintiff "on a temporary basis to give

him additional time to evaluate and consider alternative jobs."  *Id*. ¶ 23.  While Plaintiff bid on

two other jobs during his leave of absence, it is undisputed that other employees who were

members of the Union won those jobs because they had greater seniority (and it is unclear

whether Plaintiff could have performed those jobs anyway).  *Id*. ¶¶ 27, 28; *see* CBA Article 18

§ (1), Myrtue Aff. Ex. 5, ECF No. 43-2 at 30–34 ("Full-time employees with the greatest

seniority shall have preferences in . . . transfers to available permanent vacancies."); *Eckles v.

Consol. Rail Corp*., 94 F.3d 1041, 1051 (7th Cir. 1996) ("[T]he ADA does not require disabled

individuals to be accommodated by sacrificing the collectively bargained, bona fide seniority

rights of other employees.").  Plaintiff does not point to any other jobs for which Defendant

failed to help him sign up.

To the extent that Plaintiff argues that Defendant failed to engage in the interactive

process to determine his accommodations, the Court likewise finds that Plaintiff has failed to

create a genuine dispute of material fact sufficient to survive summary judgment.  Plaintiff

claims that "Myrtue sent [him] home every time [he] talked to her about accommodations and

refused to meet with [his] counselor."  Pl.'s Mem. Supp. Resp. Mot. Summ. J. 3.  These

assertions are unsupported by citations to evidence in the record.  And Plaintiff does not point to

specific consequences of any alleged failure to engage in the interactive process.  *See Rehling*,

207 F.3d at 1015–16 (finding that "[b]ecause the interactive process is not an end in itself, it is

not sufficient for [an employee] to show that [an employer] failed to engage in an interactive

process or that it caused the interactive process to break down" but that rather, the employee

"must show that the result of the inadequate interactive process was the failure of [the employer]

to fulfill its role in determining what specific actions must be taken by an employer in order to

provide the qualified individual a reasonable accommodation" (quotation marks omitted)).  In

the letter Plaintiff sent to Defendant on January 14, 2019, he asks Defendant to "send video from

[his] workplace to OSHA[ and his doctors] in order to get a permanent restriction and return to

work."  Jan. 14, 2019 Letter.  This could perhaps be characterized as a request to continue to

engage in the interactive process with Defendant to determine what accommodations would be

appropriate, but Plaintiff fails to show that Defendant's refusal to provide the video resulted in its

failure to determine specific accommodations that would have permitted Plaintiff to do his job

successfully.  *See Rehling*, 207 F.3d at 1015–16.

Finally, Defendant was not required to permit Plaintiff to remain on a leave of absence

indefinitely as an accommodation.  Plaintiff argues that Defendant "decided when the leave of

absence would expire" and "didn't tell [him] how long [he] would be on leave of absence."  Pl.'s

Mem. Supp. Resp. Mot. Summ. J. 8.  But "a long-term leave of absence cannot be a reasonable

accommodation."  *Severson v. Heartland Woodcraft, Inc*., 872 F.3d 476, 481 (7th Cir. 2017).

Plaintiff cannot successfully argue that his termination after spending a full year on an unpaid

leave of absence proves Defendant's failure to adequately accommodate him.[23]

---

[23] Plaintiff also argues that Defendant failed to reasonably accommodate him by "refusing to provide an alarm for break time, and when we are done on the floor."  Pl.'s Mem. Supp. Resp. Mot. Summ. J. 6.  He cites to no evidence to support that he asked for and Defendant failed to provide this and makes no further argument that this would have been a reasonable accommodation.  In the January 14, 2019 letter, Plaintiff asked for "a device to talk to [his] supervisor to address safety concerns [he] may observe" and for Defendant "to inquire if [it] could purchase E-sight glasses for [him] to use at work so [he] can be safe and successful."  Jan. 14, 2019 Letter.  Without any elaboration as to these requests elsewhere in the record or in Plaintiff's memorandum, the Court cannot determine that any action or inaction by Defendant as to these requests constitutes a failure to adequately accommodate Plaintiff.  He further asks to be "paid from November 7th [sic] because [he] stayed home for [his] health condition" and to gain

In sum, Defendant engaged in discussions with Plaintiff regarding his accommodations, assigned him to jobs that he could perform, modified the jobs where necessary to accommodate his disabilities, and, when he no longer wished to perform his job, allowed him a one-year leave of absence to give him time to consider his options. Plaintiff has failed to show the existence of a genuine dispute of material fact as to whether Defendant failed to reasonably accommodate him, even if he were a qualified individual. As such, the Court grants summary judgment in Defendant's favor on the failure to accommodate claim.

### ii. Retaliation

The ADA also provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [it]." 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation, a "plaintiff must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). At summary judgment, "the plaintiff[] must produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have." *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) (affirming a grant of summary judgment in favor of the employer where "the plaintiffs' argument for retaliatory animus relies entirely on speculation").

A plaintiff can prove causation through either though the burden-shifting framework set forth in *McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or through an evaluation of the evidence as a whole. *See Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595,

---

"access to [his] paystubs." Jan. 14, 2019 Letter. Because these requests do not pertain to his ability to perform his job, they do not constitute requests for accommodations. *See Vande Zande*, 44 F.3d at 542.

601 (7th Cir. 2011).[24]   Under the burden-shifting framework, "the plaintiff must demonstrate that he (1) engaged in protected activity; (2) was performing his job satisfactorily; and (3) was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer." *Id*. at 601–02.  "Once a plaintiff satisfies his initial burden, the burden then shifts to the defendant to present a non-invidious reason for the adverse employment action," and "[i]f the defendant meets this burden, the plaintiff must then demonstrate that the defendant's proffered reason was pretextual." *Id*. at 602.  The ultimate burden of demonstrating that the defendant engaged in unlawful retaliation "always remains with the plaintiff." *See Hudson v. Chi. Transit Auth*., 375 F.3d 552, 561 (7th Cir. 2004).

As Defendant points out, *see* Def.'s Mem. Supp. Mot. Summ. J. 18, Plaintiff fails to identify any similarly situated employee who did not engage in protected activity and did not suffer adverse employment action.[25]   He merely argues that "[e]mployees got hurt all the time at [Defendant's facility], and they accommodated them by finding them other jobs to do" and that he is "the only blind person working on the kill floor."  Pl.'s Mem. Supp. Resp. Mot. Summ. J. 8; *see also id*. at 4 ("I am the only blind person/ the defendant put on the kill floor to work/ can

---

[24] While courts previously distinguished direct from indirect evidence of causation when evaluating a claim of retaliation, the Seventh Circuit "recently jettisoned that approach in favor of a more straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?" *Lord*, 839 F.3d at 563 (citing *Ortiz v. Werner Enters., Inc*., 834 F.3d 760, 765 (7th Cir. 2016)); *see Miranda v. Wis. Power & Light Co*., 91 F.3d 1011, 1017 (7th Cir. 1996) (finding it "appropriate to borrow" from cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17, and other anti-discrimination statutes when analyzing claims under the ADA because the statutes are similar).  However, the *McDonnell Douglas* burden-shifting framework remains an appropriate way to analyze causation.  *See Ortiz*, 834 F.3d at 766.

[25] Myrtue attests that the Joslin facility "applies the LOA Policy in a consistent manner" and that during the period from January 1, 2019 to February 15, 2023, "the Joslin facility terminated the employment of 232 employees (including Plaintiff) under the terms of the LOA Policy for failing to return to work following the expiration of their leaves of absence."  Myrtue Aff. ¶ 31.  Plaintiff does provide a list of names, obtained from Defendant, identifying ten employees who were terminated for overextending their leaves of absence in 2019 and 2020.  Interrogatory Answer, Pl.'s Resp. Mot. Summ. J. Ex. 10, ECF No. 45-3 at 10.  Plaintiff was the only employee on this list "on a purported disability-related leave of absence."  *Id*.  No information is provided as to whether these employees engaged in protected activity, nor are the names of employees who did not engage in protected activity and were not terminated upon overextending a leave of absence provided.

send home because of accommodations, put on a NON FMLA leave unpaid for a year.").  But not only does he not cite to any evidence in support of this, he also identifies no specific other employees, as required.  This precludes him from prevailing under the burden-shifting framework.[26]  *See Brown*, 700 F.3d at 1106 (finding that the plaintiffs' arguments under the burden-shifting method failed because they were required to provide evidence that "a similarly situated employee who did not engage in the statutorily protected activity received better treatment" and "plaintiffs . . . pointed to [no] such person").

Plaintiff has also failed to provide evidence as a whole from which a reasonable jury could conclude that his requests for accommodations prompted his termination or any other adverse employment action.  Plaintiff asserts in his response that he "was sent home many times because [he] requested accommodations."  *See* Pl.'s Mem. Supp. Resp. Mot. Summ. J. 1; *see also id.* at 3 ("Myrtue sent me home every time I talked to her about accommodations . . . ."); *id.* at 6 ("[D]efendant failed to reasonably accommodate my disability . . . [b]y sending me home every time I ask for accommodation."); *id.* at 7 ("[H]uman resources sent me home every time I talk about accommodations.").  But he provides no evidence to support these assertions, as required at summary judgment.  *See* Civil L.R. 7.1(D)(2)(b)(2).  Nor does he provide any other evidence linking his request for accommodations to any adverse employment actions.  And the mere fact that Plaintiff requested accommodations and was subsequently terminated is not sufficient in itself to show causation.  *See Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) ("[T]emporal proximity between an employee's protected activity and an adverse

---

[26] Defendant also argues that Plaintiff was not meeting its legitimate performance expectations at the time he was terminated.  Def.'s Mem. Supp. Mot. Summ. J. 17–18.  Because Plaintiff has failed to identify a comparator, the Court need not address this argument.

employment action is rarely sufficient to show that the former caused the latter." (quotation marks omitted)).

As such, a reasonable jury could not find that Defendant retaliated against him under the ADA. *See Basith*, 241 F.3d at 933 ("[The employee] makes no attempt to show that [his employer's] employment actions would not have occurred but for his protected expression, and this is fatal to his claim."). Defendant is entitled to summary judgment on Plaintiff's ADA retaliation claim.

### iii. Disparate Treatment

As the Court noted above, *see supra* Section II(b), Plaintiff alleges that Defendant discriminated against him on the basis of his disability by terminating him, Am. Compl. 3; *see also id.* at 4 ("[Defendant] terminated my employment on December 10th, 2019. I believe I have been discriminated against because of my disability . . . ."). Despite asking for "summary judgment on all counts of Plaintiff's . . . [c]omplaint," Def.'s Mot. Summ. J. 1, Defendant addresses only the theories of retaliation and failure to accommodate under the ADA, *see* Def.'s Mem. Supp. Mot. Summ. J. 1, 12–18. Because of its failure to address the disparate treatment claim, the Court cannot grant Defendant's request for summary judgment on the amended complaint in its entirety. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying *each claim or defense*—or the part of each claim or defense—on which summary judgment is sought." (emphasis added)).

Based on the evidence currently before the Court, however, it appears that Defendant may also be entitled to summary judgment on this claim. To prevail on an ADA disparate treatment claim, a plaintiff must show "(1) that the plaintiff is disabled within the meaning of the ADA; (2) that the plaintiff is qualified to perform the essential functions of the job with or

without accommodation; and (3) that the plaintiff has suffered an adverse employment action because of his disability." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014). From the evidence before the Court, it does not appear that Plaintiff can put forth evidence to satisfy all three of these elements, in particular finding that there is no evidence to support that he was terminated because of his disability.[27]  It is undisputed that Plaintiff was placed on a one-year unpaid leave of absence pursuant to Defendant's LOA Policy effective October 30, 2018, that he was warned on October 30, 2019 that his leave had come to an end and he would be terminated if he did not contact Defendant within a certain period of time, and that he did not contact Defendant and was accordingly terminated.  The record contains no evidence of other non-disabled employees who were not terminated for overextending their leave of absence under the LOA Policy.  And Defendant offered the Hang Paper on Brisket job to Plaintiff, even after he had begun his unpaid leave, and reasonably accommodated him in that position.  *See supra* Section II(b)(i).

As such, the Court is inclined to enter summary judgment in Defendant's favor on the disparate treatment claim, which it may do pursuant to Federal Rule of Civil Procedure 56(f) after providing for an opportunity to respond.  *See* Fed. R. Civ. P. 56(f)(3) ("After giving notice and a reasonable time to respond, the court may consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.").  To that end, Defendant may submit a brief, along with any supporting evidence, on whether summary judgment should be granted in its favor on the ADA disparate treatment claim.  Plaintiff may file

---

[27] At his deposition, Plaintiff affirmed that he "believe[d] that [Defendant] terminated [his] employment because [he was] disabled" and "believe[d] that if [he] weren't disabled, [Defendant] would not have terminated [his] employment."  Adzogble Dep. 70:6–13.  But Plaintiff needs more than this to prevail at summary judgment.  *See Kizer v. Child.'s Learning Ctr.*, 962 F.2d 608, 613 (7th Cir. 1992) ("[A] subjective belief of discrimination no matter how genuine, cannot be the sole basis for a finding of discrimination." (alteration in original) (quotation marks omitted)).

a response to that brief within twenty-one days of service of the brief, and Defendant may then file a reply within fourteen days of service of the response.

## CONCLUSION

For the foregoing reasons, Defendant Tyson Fresh Meats, Inc.'s Motion for Summary Judgment, ECF No. 41, is GRANTED to the extent that it seeks judgment on Plaintiff Jeremiah Adzogble's failure to accommodate and retaliation claims under the Americans with Disabilities Act ("ADA") and his claims under the Family and Medical Leave Act. Defendant may submit an additional brief on whether the Court should grant summary judgment in its favor on Plaintiff's ADA disparate treatment claim within twenty-one days of entry of this Order. Plaintiff may file a response to that brief within twenty-one days of service of the brief, and Defendant may then file a reply within fourteen days of service of the response. The Clerk is directed to replace "Tyson Foods, Inc." in the caption with "Tyson Fresh Meats, Inc."

Entered this 12th day of June, 2023.

s/ Sara Darrow
_____
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE